.        IN THE COURT OF APPEALS OF TENNESSEE
                     AT KNOXVILLE
                  October 27, 2015 Session

### TIMOTHY JAMES HARDIN v. VERONICA HENSLEY-HARDIN

**Appeal from the Circuit Court for Sevier County**
**No. 2010-0314-II     Hon. Richard R. Vance, Judge**

_____

**No. E2014-01506-COA-R3-CV – Filed December 18, 2015**

_____

This appeal concerns a divorce action in which the trial court referred all issues to a special master.  As pertinent to this appeal, the special master recommended awarding the parties a divorce based upon stipulated grounds and found that the husband was entitled to an award of alimony in solido and retroactive child support.  The special master's detailed report also contained specific recommendations concerning the classification and division of the marital property.  Both parties filed exhaustive exceptions to the report.  Following a hearing, the trial court adopted the report.  The wife appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J. and D. MICHAEL SWINEY, J., joined.

Steven E. Marshall, Sevierville, Tennessee, for the appellant, Veronica Hensley-Hardin.

Cynthia R. Wyrick, Sevierville, Tennessee, for the appellee, Timothy James Hardin.

**OPINION**

### I.      BACKGROUND

Veronica Hensley-Hardin ("Wife") and Timothy James Hardin ("Husband") (collectively "the Parties") were married in January 1992.  Four children were born of the marriage.  One child died during the marriage.  The remaining children and their residential schedule are not at issue on appeal.  Throughout the marriage, Husband operated a heating and air conditioning business, TNT Service Company ("TNT"), while Wife worked in the Sevier County School System.

Despite a modest income from their regular employment, the Parties amassed a significant marital estate. Likewise, Wife acquired a significant amount of property through inheritance and gifts from family members. A significant issue on appeal concerns the Hardin-Hensley Partnership ("the Partnership")[1] and a real estate holding company, Raeco, Inc. ("Raeco") originally formed by Wife's father, Don Hensley, and his business partner, Raymond Cook. The real estate owned by the Partnership and Raeco (collectively "the Company") includes 13 residential rental properties and 1 commercial property. During the marriage, Wife and her brother, Scott Hensley,[2] contracted to purchase Mr. Cook's one-half interest in the Company for $450,000. Wife and Scott funded their purchase with income from the Company. Thereafter, Don offered to sell his one-half interest in the Company to Wife and Scott for $450,000. They agreed and began remitting payments until Don passed away. They forgave the remaining debt of $416,668 as the sole heirs to Don's estate. Husband performed work for the Company but was not a party to either contract.

In April 2010, Husband sought a divorce after approximately 18 years of marriage. Husband alleged that he was entitled to a divorce based upon Wife's inappropriate marital conduct and their irreconcilable differences. As pertinent to this appeal, he sought alimony and an equitable division of what he deemed was marital property, including the Company. Wife responded by filing a counter-complaint for divorce, denying the alleged inappropriate marital conduct but agreeing that divorce was appropriate based upon their irreconcilable differences or stipulated grounds. She denied that Husband held any interest in the Company.

Given the size of the marital estate and the detailed property issues, the court referred all issues to a special master, the Honorable Brent R. Watson, Esquire ("the Special Master"). Neither party objected to the appointment of the Special Master. The Special Master held numerous proceedings before holding a final hearing several years after the initiation of the divorce complaint.

At the final hearing, Tim Threlkeld and Peter Medlyn, employees of Property Service Group, testified as to their appraisal of several of the properties at issue, including those held by the Company. Ben Broome, another employee of Property Service Group, confirmed the processes used to appraise the properties. All admitted that they did not have any information concerning Husband's ownership interest.

---

[1] The Partnership was originally named the Cook and Hensley Partnership.
[2] In order to avoid confusion, we will refer to Scott Hensley as "Scott" and Don Hensley as "Don."

Walter James Lloyd, a partner with Pershing, Yoakley, and Associates, testified concerning his expertise in the field of business valuation. He was asked to appraise the Partnership and Raeco. He ultimately assigned a value to the Company as a whole using the net asset value method. In his report, he explained that the net asset value method "produces an indication of value by adjusting the entity's assets and liabilities to their respective current values. The liabilities are then subtracted from the assets to determine the net asset value of the entity." He believed the most accurate way in which to assess a value in this case was to appraise the properties held by the Company using an MAI certified real estate appraiser. The properties were appraised as follows:

| Property | Description | Appraised Value |
|---|---|---|
| 789 West Main Street | Apartment complex | $1,400,000 |
| 428 Keegan Drive | Apartment complex | $2,400,000 |
| 519 King Hills Blvd. | Single family residence | $185,000 |
| 1540 Retreat Street | Single family residence | $112,000 |
| 117 Franklin Dr. | Duplex | $85,000 |
| 204 Sunnyside | Duplex | $85,000 |
| 3190 Birds Creek | Single family residence | $215,000 |
| Murrell Meadows | Vacant lot | $50,200 |
| 316 Club Drive | Apartment complex | $2,400,000 |
| Smoky Mountain Lane | Commercial lot | $300,000 |
| 422 W. Mill Creek Rd. | Vacant lot | $120,000 |
| 1436 W. Union Valley Rd. | Single family residence | $90,000 |
| 422 Boyds Creek | Vacant lot | $30,200 |
| Foxfire Way | Single family residence | $275,000 |
| | | |
| **Total value per appraisals** | | $7,747,400 |

Based upon his research, he estimated that the Company held a low value of $7,382,087, a baseline value of $7,770,618, and high value of $8,159,149. After adjusting for lack of control and marketability based upon the pending divorce, he calculated an indication of value for a 50 percent interest in the Company at a low value of $3,158,000, a baseline value of $3,324,000, and a high value of $3,491,000. He agreed that his valuations could change in the event that the total cash assets had not been fully disclosed.

Mr. Lloyd was also asked to appraise TNT. Using the net asset value method, he estimated that TNT held a low value of $13,600, a baseline value of $14,300, and a high value of $15,000. He noted that an adjustment for lack of control or marketability was not required given Husband's sole ownership. He agreed that he was unaware as to whether Husband had failed to report cash received in the course of his employment.

Terry Barton Moneymaker, an accountant for PGM Accounting and Tax Service, provided that she had prepared the Company's tax returns as well as the personal tax returns for the Parties. She identified the Partnership's 2012 tax return, which reflected a gross rental income of $752,560 and cash on hand of $291,872. She noted that the Partnership held a total debt of $386,987 and other liabilities of $24,252. She provided that the net income for the Partnership was $133,088. She identified the Partnership's 2011 tax return, which reflected a gross rental income of $540,002 and cash on hand of $182,399. She agreed that there was a substantial increase in gross rental income from 2011 to 2012. She recalled that the Company experienced an increased occupancy rate and that significant expenditures had been made to update the rental properties in 2012.

Ms. Moneymaker identified the amortization schedule for the liability to Mr. Cook. The schedule reflected that the liability was fulfilled on December 1, 2012. She provided that the Partnership remitted payment for the liability to Mr. Cook and that neither Wife nor Scott personally remitted payment. She related that the Partnership also remitted payment for Wife and Scott's personal tax liability as a result of their ownership interests. She agreed that Husband had not remitted any monetary contributions to the Company and had never remitted any payment on the debt owed by the Company. Likewise, she did not know whether he contributed to the acquisition, appreciation, or preservation of the Company.

Ms. Moneymaker identified Wife's 2010, 2011, and 2012 tax returns and her W-2 forms for 2010 and 2012. She did not have a copy of Wife's 2011 W-2 form. She provided that Wife's adjusted gross income in 2012 was $114,239, which did not include her contributions to retirement, her flex saving account, or any deferred income. She agreed that Wife's income would not include rental income from the Company if the money had not been deposited in the bank.

Coley Jones testified that he has been employed by the Company for seven years. He began as an on-site manager and painter and now works on a full-time basis in the maintenance department. The Company provides him with an apartment as part of his compensation. He is responsible for several employees, including a heating and air conditioning repairman. He provided that in 2010, Husband performed maintenance tasks as needed, namely he assisted him in repairing a faucet and in repairing a waterline. He agreed that Husband also repaired air conditioning units as needed and provided him with some basic knowledge concerning air conditioning repair. He provided that the Parties have not been active on the properties since Scott took control.

Marion Franklin testified that she was hired by the Partnership in August 2010. She provided that Wife taught her to complete lease agreements, rent receipts, and rent logs and also introduced her to the tenants when she was first hired. She worked with

- 4 -

Wife on a daily basis from August 2010 until January 2011, when Scott took control of the Company. She recalled observing Husband performing maintenance on one occasion in September 2010. She claimed that she had not seen him perform work since that day.

Ms. Franklin testified that the rental units had a rate of occupancy of approximately 50 percent when she was hired. They reached full occupancy in 2011 as a result of major renovations, publicity, and the improved maintenance of the units. She agreed that she regularly destroyed the rent logs documenting the payment of rent until she was instructed otherwise by the Special Master.

Scott acknowledged that he and Wife purchased one-half of an interest in the Company from Mr. Cook for $450,000 and that they entered into an agreement to purchase the other half from their father for $450,000. He provided that they fulfilled their liability to Mr. Cook in April 2013, not December 2012. He acknowledged that they remitted cash payments to Mr. Cook and that these payments were not documented by anyone other than Mr. Cook. He asserted that they owed their father approximately $416,668 at the time of his death. They forgave the debt as heirs to the estate.

Husband recalled performing maintenance on the properties held by the Company, maintaining the heating and air units, and even assisting with plumbing issues. He testified in detail concerning his assistance with several maintenance projects. He estimated that either he or Wife spent five to seven hours every other weekend for three years mowing the properties. He recalled assisting with rental deposits, stocking the vending machines, and retrieving quarters from the laundry machines. He estimated that he spent approximately 10 hours per week on the properties during the summertime. He acknowledged that he failed to keep a record of his time spent working on the properties.

Husband testified that he was an authorized signatory on the account for the Company. He claimed that cash was not always reported or deposited. He recalled viewing approximately $30,000 in the Company's safe and counting approximately $19,000 in quarters from the laundry and vending machines. He estimated that Wife maintained possession of approximately $30,000 in quarters. He acknowledged that he had not performed any additional work on the properties since January 2011. He explained that he was not welcome on the properties following their separation.

Husband testified that in addition to Wife's interest in the Company, he and Wife acquired several properties with Scott and his wife, Pam Hensley (collectively "the Hensleys"). Specifically, they built ten houses in a subdivision and sold all but two of the houses, 1801 Helen Court and 3328 Frontier View, which they maintained as rentals. He claimed that he has not realized any income from the properties since the separation.

Relative to TNT, Husband testified that he founded the company with his twin brother, who later left the business. He primarily performs service calls for residential customers. He admitted that he had not always reported cash received from clients but claimed that he now reports the majority of his income, other than approximately $1,500 to $2,000 in cash per year. He agreed that he uses business credit cards to pay for personal liabilities, including a subscription to Direct TV, his personal cellular telephone and vehicle, and meals.

Husband testified extensively concerning various items of personal property, including Sea-Doos and several Robert Tino and Terry Redlin prints. He asserted that he spent time with the Children using the Sea-Doos. He noted that he and Wife purchased several prints throughout the marriage. He could not remember which prints were gifts from his mother-in-law and which were acquired by them. He requested an equal division of the prints.

Wife testified extensively concerning her separate property that she received from her family. She asserted that Husband had not made any substantial contribution to the acquisition, preservation, or appreciation of any of the properties. She agreed that she and Husband received gifts of property from her family in addition to what she was personally provided in the form of property and cash.

Wife testified that she received money from the Company to pay her income taxes. She agreed that she also paid herself $10,000 from the Company in 2010. She asserted that she financially provided for the children since the separation and identified a comprehensive list of expenses, totaling $24,523.

Mr. Cook testified that he and Don formed Raeco and began constructing apartments in 1990. He claimed that Husband, who was always paid for his services, began providing assistance in 1997. He stated that he and Don structured the business to exclude spouses to keep the business in the immediate family. He recalled that he was paid $450,000 over the course of 15 years for his interest in the Company. He agreed that Husband delivered cash payments to him on occasion. He acknowledged that he transferred several pieces of property to the Company when he sold his interest. He agreed that additional complexes were built following the transfer of his interest. He denied knowledge concerning Husband's involvement in the construction following the transfer of his interest in the company.

Following the hearing, the Special Master issued a detailed report, in which it recommended awarding the Parties a divorce, classifying and dividing the property at issue, awarding Husband alimony in solido, and entering a permanent parenting plan and child support order. As pertinent to this appeal, the Special Master found that Wife was

entitled to her separate property in the amount of $453,080.72.  However, the Special Master held that Wife's interest in the Company was marital property pursuant to Tennessee Code Annotated Section 36-4-121 because it was acquired during the marriage by means other than gift or inheritance.  The Special Master continued,

> [Wife] and [Scott] purchased one-half [from Mr. Cook] for $450,000 and one-half [from their father] for $450,000.  However, shortly after [Wife] and [Scott] purchased their father's [interest], the father died.  At the time of [his] death, there was approximately $417,000.00 left owing on the balance of the $450,000.00 note . . . .  [Wife] and [Scott] forgave the Note, which, in essence, paid for the balance of [Wife's] interest in [the Company].  As stated previously, approximately $33,000.00 had been paid on the original purchase price which would be approximately 7.3% of the purchase price.  Therefore, 7.3% of the interest . . . was paid for from marital property and the remaining 92.7% was paid for from [her] separate property through the inheritance from her father.
>
> Although all of [Wife's] interest in the [Company] is marital property, the Special Master finds that [Wife] should be awarded 92.7% of the interest she purchased from her father and was paid from her separate property, and the remaining 7.3% should be divided between the parties.  The Special Master finds that it is material that [she] paid 92.7% of the purchase price from her share of her father's interest from her separate property, her interest in the [Company] has never been co-mingled with other marital property, and [Wife] has been involved in the active management of these businesses.

The Special Master found that the interest purchased from Mr. Cook should be equally divided.  He accepted Mr. Lloyd's 50 percent baseline value of $3,324,000 and found that Wife should be awarded $1,539,012 of the interest obtained from her father in recognition of her substantial contribution to the acquisition and preservation of that portion of the Company and that the remaining $1,784,988 interest should be divided equally.  The Parties agreed, and the Special Master concurred, that the interest should be awarded to Wife to avoid positioning Husband as an unwelcome business partner.

The Special Master divided the marital property[3] as follows:

| Property | Wife | Husband |
|---|---|---|
| ½ interest in the Company | $1,781,664 | |
| TNT Service Co. | | $14,314 |
| 3170 Birds Creek | | $300,000 |
| ¼ interest in Lots 113 and 114 Birds Creek | $62,500 | $62,500 |
| 985 Boardly Hills Blvd. | ($12,246.31)[4] | |
| ½ interest in Locust Ridge | | $10,250 |
| ½ interest in 1801 Helen Court (less debt of $17,563) | | $57,437.00 |
| ½ interest in Turkey Hollow Lane | | $34,650 |
| ½ interest in 3328 Frontier View | | $80,000 |
| Various items of personal property | $10,699.50 | $79,203 |
| Cash assets | $9,488.9 | $177,366.79 |
| | | |
| **Total award[5]** | **$1,852,106.99** | **$815,720.79** |

Relative to alimony, the Special Master found that the majority of the factors contained in Tennessee Code Annotated section 36-6-121(i) were equally weighted, with the exception of Wife's numerous separate assets and the way in which the marital property was divided. The Special Master awarded Husband $500,000 as alimony in solido, payable at a rate of $4,166.67 per month for ten years, to equalize the division of the marital property. The Special Master found that each party should bear his or her own attorney's fees and litigation expenses, noting that each party had received significant assets from which to pay fees and expenses.

Relative to child support, the Special Master completed three separate child support worksheets to calculate the amount of retroactive child support owed for three separate time periods and to set the current child support ordered. He found that Husband was entitled to an award of retroactive child support for the period preceding the entry of the current child support order. However, the current child support order required Husband to remit child support at the rate of $282 per month.

---

[3] The Special Master provided detailed findings in support of its classification of the real property not included in the Company as marital property. These findings do not appear to be at issue in this appeal. A number of the properties were acquired by the Parties and the Hensleys.

[4] This property was encumbered beyond its appraised value.

[5] The total provided here reflects the Special Master's adjustment pursuant to a supplemental report.

The Parties filed exhaustive exceptions to the Special Master's report. A hearing was held on the exceptions before the trial court.[6] Following the hearing, the court adopted the Special Master's report in its entirety. The court stated, in pertinent part,

> Based upon the statements of counsel and the record as a whole, the Court finds as follows:
>
> 1.     That the Court has carefully reviewed and considered the record in this cause, including the Report of the Special Master and the Exceptions filed by counsel.
>
> 2.     That the Special Master conducted an exhaustive investigation as to the extensive property and business interests of the parties and prepared a very detailed report.
>
> 3.     That the Special Master did an excellent job in performing his work, and the Court having considered all of the relevant and material factors finds that the Report he submitted should be adopted in full.
>
> 4.     That the Court specifically finds the division of the parties' marital estate, including assets and liabilities, recommended by the Special Master to be fair and equitable to the parties.
>
> 5.     That the Court finds the Permanent Parenting Plan recommended by the Special Master to be in the best interest of the parties' minor children.

The court taxed the costs equally and approved the Special Master's fee. Wife's timely appeal followed.

---

[6] Neither a transcript nor a statement of the evidence was filed for this court's review.

## II.    ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.    Whether the court erred in assigning all issues to the Special Master.

B.    Whether the court erred in adopting the Special Master's report without issuing its own findings of fact and conclusions of law.

C.    Whether the court erred in classifying the Company and items of personal property as marital property.

D.    Whether the court erred in dividing the marital estate.

E.    Whether the court erred in setting the amount of child support owed.

F.    Whether the court erred in awarding Husband alimony in solido.

G.    Whether Husband is entitled to an award of attorney fees, costs, and litigation expenses.

## III.    STANDARD OF REVIEW

The referral of all issues in this case to the Special Master affects our standard of review on appeal concerning the factual findings of the trial court. Our Supreme Court summarized the standard of review in such cases as follows:

> Concurrent findings of fact made by the [trial court] and special master and supported by material evidence are binding upon the appellate court. However, issues not proper to be referred, findings based on an error of law, mixed questions of fact and law, and findings unsupported by material evidence are not.

*Fayne v. Vincent*, 301 S.W.3d 162, 169 (Tenn. Dec. 2009) (internal citations omitted); *see also Franklin v. DeKlein-Franklin*, No. E2007-00577-COA-R3-CV, 2008 WL 1901113, at *15-16 (Tenn. Ct. App. Apr. 30, 2008) (confirming that the concurrent

finding rule applies to all divorce cases, whether filed in a chancery or circuit court).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal."  *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

## IV.   DISCUSSION

### A.

Wife argues that the trial court erred by referring all issues to the Special Master.  She claims that a court's referral to a special master is limited to collateral, subordinate, or incidental issues.  Husband responds that Wife has waived review of this issue because she never objected to the appointment of the Special Master.  Alternatively, he argues that the court acted within its authority in appointing the Special Master to hear all issues.

Neither party objected to the appointment of the Special Master at the trial court level.  Wife also did not raise this issue as an exception to the Special Master's report.  A party may not offer a new issue for the first time on appeal.  *See Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010) (citing *Campbell Cnty. Bd. of Educ. v. Brownlee-Kesterson, Inc.*, 677 S.W.2d 457, 466-67 (Tenn. Ct. App. 1984)).  "If a party fails to object to the special master's actions before the master's report is adopted by the trial court, then the objection is waived."  *Brady v. Brady*, No. M2014-01598-COA-R3-CV, -- WL -- (Tenn. Ct. App. Aug. 18, 2005).  Despite the potential for waiver, we will address the issue in the event of further appellate review.

Rule 53 of the Tennessee Rules of Civil Procedure governs the appointments of special masters.  Once appointed, the trial court may choose to limit or specify the role of the special master.  Tenn. R. Civ. P. 53.02.  ("The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only, and may fix the time and place for beginning and closing the hearings and for the filing of the master's report.").  Such limitation is not required by the Rules.  Contrary to Wife's assertion, the court may refer all issues, including the main issue of controversy, without limitation and without abdicating its judicial authority to make the ultimate determination.  Tenn. R. Civ. P. 53.04.  ("The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.").  *See also Franklin*, 2008 WL 1901113, at *8-9 (rejecting

a similar argument).  Accordingly, we conclude that the court did not err in referring all issues of controversy to the Special Master.

B.

Wife next argues that the trial court erred by failing to issue its own findings of fact and conclusions of law.  She requests remand for the entry of written findings and conclusions.  Alternatively, she argues that the court's assignment of all issues and failure to issue its own findings and conclusions affects the standard of review on appeal.  She claims that we must review the issues de novo *without* a presumption of correctness.  Husband responds that the court's adoption of the report was proper and tantamount to an issuance of findings and conclusions in compliance with the Rules of Civil Procedure.  He notes that Wife waived review of the issue by failing to include a transcript of the hearing during which the court considered the exceptions filed by the Parties.

The failure to file a transcript or statement of the evidence of the proceedings in the trial court generally frustrates this court's review.  An appellant must prepare a record that "conveys a fair, accurate and complete account of what transpired with respect to those issues that are the bases of the appeal."  Tenn. R. App. P. 24(b); *Nickas v. Capadalis*, 954 S.W.2d 735, 742 (Tenn. Ct. App. 1997).  When an appellant fails to produce a record of trial, it is presumed that the evidence supports the ruling of the court.  *Bishop v. Bishop*, 939 S.W.2d 109 (Tenn. Ct. App. 1996).  Despite the potential for waiver, we will address the issue in the event of further appellate review.

Rule 52.01 of the Tennessee Rules of Civil Procedure provides, in pertinent part, as follows:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.  The findings of a master, *to the extent that the court adopts them*, shall be considered as the findings of the court.  If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

(Emphasis added).  While the trial court need not issue separate findings and conclusions, it should not simply adopt the report without consideration.  *Filmtech v. McAnally*, No. E2011-00659-COA-R3-CV, 2011 WL 6780176, at *2-3 (Tenn. Ct. App. Dec. 22, 2011).  Indeed, the court must retain its judicial power and make the ultimate determinate.  *Id.*

Here, the trial court adopted the report in toto, thereby establishing compliance with the Rules of Civil Procedure insofar as the court is required to issue findings of fact and conclusions of law. Furthermore, the trial court stated, in pertinent part, as follows:

> 1. That the Court has carefully reviewed and considered the record in this cause, including the Report of the Special Master and the Exceptions filed by counsel.
>
> 2. That the Special Master conducted an exhaustive investigation as to the extensive property and business interests of the parties and prepared a very detailed report.
>
> 3. That the Special Master did an excellent job in performing his work, and the Court having considered all of the relevant and material factors finds that the Report he submitted should be adopted in full.

Thus, the record reflects that the trial court did not simply "rubber stamp" the report. The court exercised its own independent judgment before adopting the report. *See generally Tarver v. Garrison's Custom Cabinets, Inc.*, No. W2006-01765-COA-R3-CV, 2007 WL 3194566, at *2 (Tenn. Ct. App. Oct. 31, 2007) ("Should [the trial court] decide to confirm the master's report, it must be satisfied, after exercising its independent judgment, that the master is correct in the decision he has made."). With all of the above considerations in mind, we conclude that this issue is without merit.

## C.

"Tennessee is a 'dual property' state because its domestic relations law recognizes both 'marital property' and 'separate property.'" *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010) (citing *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009); Tenn. Code Ann. § 36-4-121). The division of the parties' marital estate begins with the classification of the property as separate or marital; separate property is not part of the marital estate and, therefore, is not subject to division. *Id.*

Separate property is defined as,

> (A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 as amended;

- 13 -

(B)     Property acquired in exchange for property acquired before marriage except when characterized as marital property under subdivision (b)(1);

(C)     Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

(D)     Property acquired by a spouse at any time by gift, bequest, devise or descent;

(E)     Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and

(F)     Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2).  In contrast, marital property is defined, in pertinent part, as

all real and personal property, both tangible and intangible, acquired by either or both spouses *during the course of the marriage* up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date.

(Emphasis added).  Tenn. Code Ann. § 36-4-121(b)(1)(A).  Marital property also

includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation[.]

Tenn. Code Ann. § 36-4-121(b)(1)(B).

- 14 -

Wife argues that the trial court erred in classifying the Company as marital property. She claims that her interest was purchased with separate property because she used income generated from the Company to pay Mr. Cook and her father. She asserts that Husband failed to substantially contribute to the acquisition, preservation, and appreciation of the Company. Husband responds that Wife has waived review of the argument that the interest was purchased with separate property because she never raised the argument at trial. He alternatively responds that the interest is marital property because it was purchased during the course of the marriage and that his contributions or lack thereof are relevant to the equitable division of the property, not the initial classification of the property as separate or marital.

"The classification of property as separate or marital presents a question of fact." *Welch v. Welch*, No. M2013-01025-COA-R3-CV, 2014 WL 107982 (Tenn. Ct. App. Jan. 10, 2014). This court must affirm if there is any material evidence to support the court's concurrence with the Special Master's classification of the interest in the Company as marital property. Here, there was material evidence from which the trial court could conclude that the interest in the Company is marital property. The interest was acquired during the course of the marriage. Additionally, Husband was a signatory on the business account and often assisted Wife with the deposit of income generated from the Company. Accordingly, we affirm the court's concurrence with the finding of the Special Master that the interest in the Company is marital property.

Wife next argues that the trial court erred in classifying two Sea-Doos and several Robert Tino and Terry Redlin prints as marital property. Husband responds that Wife presented no evidence concerning the ownership of the prints or the Sea-Doos at trial. Again, we must affirm if there is any material evidence to support the court's concurrence with the Special Master's classification of the property as marital property. A review of the records reveals material evidence from which the court could conclude that the items at issue are marital property. Husband testified that the items are marital property, and the record reflects that the prints and the Sea-Doos were enjoyed by the Parties throughout the marriage. While Husband admitted that his mother-in-law may have gifted some of the prints, he never confirmed that the gifts were intended solely for Wife's benefit. The same holds true for the father-in-law's gift of the Sea-doos. With these considerations in mind, we affirm the court's concurrence with the finding of the Special Master that these items are marital property.

D.

After identifying the marital property, the court must equitably divide the property between the parties without regard to fault. Tenn. Code Ann. § 36-4-121(a)(1); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). A division of marital property in an

equitable manner does not necessitate an equal division. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). An equitable division of property must reflect consideration of Tennessee Code Annotated section 36-4-121(c), which provides,

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) (A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

The court's distribution of property is to be achieved by considering and weighing the most relevant factors in light of the unique facts of the case. *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988).

The equitable division of the marital property is a mixed question of fact and law. *Franklin*, 2008 WL 1901113, at *16. On appeal, we presume the trial court's factual determinations as to value are correct unless the evidence preponderates against them. Tenn. R.App. P. 13(d). Thus, the trial court's distribution of the marital property is given a presumption of correctness that this court will not overturn unless it is contrary to the preponderance of the evidence. *Lancaster v. Lancaster*, 671 S.W.2d 501, 502 (Tenn. Ct. App. 1984).

The Parties take issue with the court's division of the marital property and each request a greater share of the marital estate. Wife argues that the court erroneously awarded Husband 95 percent of the marital banking and brokerage accounts and failed to give the requisite weight to her significant financial contribution to the Company. Husband responds that he is entitled to an equal share of the interest in the Company in recognition of his substantial contribution to the Company in the form of physical labor.

Contrary to the Parties' contentions, the record reflects that the factors of Tennessee Code Annotated section 36-4-121(c) guided the distribution of the marital estate. Great weight was given to Wife's substantial contribution to the acquisition, preservation and appreciation of the Company in the form of her loan forgiveness and labor. Tenn. Code Ann. § 36-4-121(c)(5)(A). While Husband also contributed to the Company, his contribution was not commensurate with Wife's and did not continue after the Parties separated. Wife is correct in her complaint that she did not receive a significant portion of the banking and brokerage accounts. However, the unique circumstances of the case necessitated an award of the majority of the liquid assets to Husband. Accordingly, we conclude that the evidence does not preponderate against the division of the marital estate and affirm the division as equitable.

Wife next argues that the distribution of the real property was inappropriate when Husband was awarded interest in properties jointly held by her relatives. She suggests an award adjustment to provide for her ownership of the properties jointly held by her relatives in exchange for her interest in 985 Boardly Hills Boulevard. Husband objects to Wife's proposed award adjustment and notes that the adjustment would greatly reduce his award of the marital property when the Boardly Hills residence is encumbered by a significant mortgage. We agree with Husband. The adjustment Wife suggests would result in an inequitable distribution of the marital property given the unique circumstances of this case.

E.

Wife takes issue with the Special Master's calculation of the amount of retroactive support owed and suggests alternative methods to determine the Parties' income for the time periods in question. Husband responds that the Special Master used an appropriate method to calculate the amount of support owed when Wife failed to present adequate documentation of her income.

This issue presents a question of fact, thereby requiring this court to affirm if there is *any* material evidence to support the court's concurrence with the Special Master's calculation. In this state, child support is governed by Tennessee Code Annotated section 36-5-101. "In making the court's determination concerning the amount of support of any minor child or children of the parties, the court shall apply, as a rebuttable presumption, the child support guidelines" that are promulgated by the Tennessee Department of Human Services Child Support Service Division. Tenn. Code Ann. § 36-5-101(e)(1)(A). In setting an amount of retroactive support, the guidelines provide as follows:

> (a) For the monthly [Basic Child Support Obligation], apply the Guidelines in effect at the time of the order, using the Child Support Worksheet. Use the average monthly income of both parents over the past two (2) years as the amount to be entered for "monthly gross income," unless the tribunal finds that there is adequate evidence to support a different period of time for use in the calculation and makes such a finding in its order. Do not include any current additional expenses on the retroactive worksheet. Complete the worksheet for the retroactive monthly amount, and multiply the amount shown on the worksheet as the "Final Child Support Order" times the number of months the tribunal has determined to be the appropriate period for retroactive support.

(b) An additional amount may be added onto the judgment for retroactive support calculated above in subparagraph (a) to account for the [alternative residential parent's] share of amounts paid by the primary residential parent for childcare, the child's health insurance premium, and uninsured medical expenses over the retroactive period under consideration, and other expenses allowed under Tennessee Code Annotated § 36-2-311.

Tenn. Comp. R. & Regs. 1240-02-04-.06(3).

Here, the Parties separated in January 2011 and shared equal co-parenting time until June 12, 2012, when the Special Master entered a temporary parent plan and ordered Husband to remit child support. The Special Master calculated the amount of retroactive support owed by the Parties for three separate time periods, namely January 2011 through December 2011; January 2012 through June 2012; and June 2012 through entry of its report on February 25, 2014. In setting the amount of retroactive support owed by Wife for 2011, the Special Master averaged Wife's income from 2010 and 2011. In setting the amount of support owed by Wife for 2012, he averaged Wife's income for 2010, 2011, and 2012. He averaged Husband's income from 2010 and 2011 to calculate the obligation for 2011 and imposed a presumptive gross income upon Husband for 2012.

Wife takes issue with the Special Master's calculations, namely she claims that he should have used a comparison worksheet to ascertain her employment income for 2010, that he erroneously used her social security wages to ascertain her employment income for 2012, and that he assigned income from the stocks and brokerage accounts to her. Relative to Husband, she claims that the Special Master committed an error of law by using Husband's reported income when Husband deducted expenses that are disallowed by the guidelines. Despite Wife's claim to the contrary, the Special Master used a presumptive gross income to calculate Husband's 2012 income and appropriately relied upon Husband's reported income for 2010 and 2011 as calculated by a tax professional. Additionally, a review of the record reflects that there is material evidence from which the trial court *could* conclude that the Special Master calculated the amount owed correctly using appropriate methods. The Special Master calculated the amounts using the required child support worksheets with supportive documentation provided by the Parties for the relevant time periods. We affirm the court's concurrence with the Special Master's calculation of the amount of retroactive child support owed.

## F.

Wife argues that the trial court abused its discretion in awarding Husband alimony in solido when he received a significant portion of their liquid assets. She claims that he is voluntarily underemployed and that she is unable to remit payment given her modest teaching salary. Husband responds that the court did not abuse its discretion when Wife received the majority of the marital estate. He notes that the award was given to equalize the division of the estate and was not based upon their relative incomes.

"Alimony" is defined, in pertinent part, by Black's Law Dictionary, 9th ed., as

> [a] court-ordered allowance that one spouse pays to the other spouse for maintenance and support . . . after they are divorced. Alimony is distinct from a property settlement.

Tennessee recognizes four different types of alimony: rehabilitative alimony, transitional alimony, alimony in futuro, and alimony in solido. Each type addresses a specific need. The type of alimony at issue in this case is alimony in solido. Alimony in solido is a long-term form of spousal support. Tenn. Code Ann. § 36-5-121(h)(1). Alimony in solido is a lump sum award of alimony, but it may be paid in installments over a specific period of time. Tenn. Code Ann. § 36-5-121(h)(1). Courts typically award this type of alimony to adjust the division of marital property. *Burlew v. Burlew*, 40 S.W.3d 465, 471 (Tenn. 2001). Alimony in solido may also be awarded to assist the disadvantaged spouse in paying attorney's fees. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000).

In setting the type, duration, and amount of support, courts are guided by the following list of factors:

> (1)     The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

> (2)     The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

> (3)     The duration of the marriage;

> (4)     The age and mental condition of each party;

(5)     The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)     The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)     The separate assets of each party, both real and personal, tangible and intangible;

(8)     The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)     The standard of living of the parties established during the marriage;

(10)    The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)    The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)    Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). In addition to the factors found in Tennessee Code Annotated section 36-5-121(i), the two most relevant factors in determining the amount of alimony awarded are the economically disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson*, 76 S.W.3d at 342. "There are no hard and fast rules for spousal support decisions, and such determinations require a 'careful balancing' of the relevant factors." *Miller v. Miller*, No. M2002-02731-COA-R3-CV, 2003 WL 22938950, at *3 (Tenn. Ct. App. Dec. 10, 2003) (citing *Anderton v. Anderton*, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998)).

Here, the court found that the majority of the factors were equally weighted, with the exception of Wife's separate assets and the division of the marital property. Tenn. Code Ann. § 36-5-121(i)(7), (8). The court found that an award of alimony in solido was appropriate to adjust the division of the marital property. We agree. Wife was awarded a significant portion of the marital estate and enjoys a much higher earning potential as a

result of the division. While such a division was necessary given the unique circumstances of the case, we agree that Husband was entitled to an award of alimony in solido to equalize the division and account for his lesser earning potential. Contrary to Wife's assertion, she has significant assets from which she can fulfill her monthly obligation. Accordingly, we hold that the trial court did not abuse its discretion in awarding Husband $500,000 in alimony in solido to be paid in equal installments of $4,166.67 per month.

G.

Husband argues that the court erred in denying his request for attorney fees, litigation expenses, and costs at trial. An award of attorney's fees in divorce cases is considered alimony or spousal support, generally characterized as alimony in solido. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002). Because attorney's fees are considered alimony or spousal support, an award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011); *Yount*, 91 S.W.3d at 783. Therefore, the statutory factors listed in Tennessee Code Annotated section 36-5-101(d)(1) are to be considered in a determination of whether to award attorney's fees. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 751 (Tenn. 2002). The decision about whether to award attorney fees as alimony in solido is within the sound discretion of the trial court, and such an award will not be disturbed on appeal unless the evidence preponderates against factual findings that support the trial court's decision. *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995).

An award of attorney's fees "is conditioned upon a lack of resources to prosecute or defend a suit in good faith." *Langschmidt*, 81 S.W.3d at 751 (quoting *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983)). If a party has adequate property and income, or is awarded adequate property in the divorce, from which to pay his or her own expenses, an award of attorney's fees may not be appropriate after consideration of all relevant factors. *Koja*, 42 S.W.3d at 98. The award of attorney's fees as additional alimony is most appropriate where the divorce does not provide the obligee spouse with a source of funds, such as from property division, with which to pay his or her attorney's fees. *Yount*, 91 S.W.3d at 783.

In recognition of the court's discretion in such matters and the availability of funds from the division of the marital property, we will not overturn the court's denial of an additional award of alimony in solido for Husband's attorney fees, litigation expenses, and costs. Accordingly, we affirm the court's order directing the parties to pay their respective attorney fees, expenses, and costs.

## V.    CONCLUSION

The judgment of the trial court is affirmed.  The case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed one-half to the appellant, Veronica Hensley-Hardin, and one-half to the appellee, Timothy James Hardin.


_____
JOHN W. McCLARTY, JUDGE